UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION
_____

LONNIE MCKISSIC,

                             Plaintiff,                     Case No. 1:20-cv-526

v.                                         Honorable Janet T. Neff

WILLIAM P. BARR et al.,

                             Defendants.
_____/

## OPINION

        This is a civil rights action brought by a state prisoner under 42 U.S.C. § 1983. Under the Prison Litigation Reform Act, Pub. L. No. 104-134, 110 Stat. 1321 (1996) (PLRA), the Court is required to dismiss any prisoner action brought under federal law if the complaint is frivolous, malicious, fails to state a claim upon which relief can be granted, or seeks monetary relief from a defendant immune from such relief. 28 U.S.C. §§ 1915(e)(2), 1915A; 42 U.S.C. § 1997e(c). The Court must read Plaintiff's *pro se* complaint indulgently, *see Haines v. Kerner*, 404 U.S. 519, 520 (1972), and accept Plaintiff's allegations as true, unless they are clearly irrational or wholly incredible. *Denton v. Hernandez*, 504 U.S. 25, 33 (1992). Applying these standards, the Court will dismiss Plaintiff's complaint for failure to state a claim.

## Discussion

### I.     Factual allegations

        Plaintiff is presently incarcerated with the Michigan Department of Corrections (MDOC) at the Muskegon Correctional Facility (MCF) in Muskegon, Muskegon County, Michigan. The events about which he complains are occurring at that facility. Plaintiff sues

Defendants United States Attorney General William P. Barr, Michigan Attorney General Dana Nessel, and MDOC Director Heidi Washington and Acting Deputing Director Ken McKee. Plaintiff alleges that his present confinement at MCF violates his right to be free of cruel and unusual punishment as guaranteed by the Eighth Amendment.  Plaintiff contends that his rights are violated because Defendants are subjecting him to the threat and imminent danger of contracting the deadly COVID-19 virus.

Plaintiff is 67 years old.  He states that he has a history of diabetes and hypertension. Plaintiff alleges several facts about prison confinement generally and the specific conditions of his confinement at MCF that would permit and even facilitate transmission of the COVID-19 virus. Plaintiff further alleges that, on May 21, 2020, he filed a complaint with the Department of Justice (DOJ) calling on the Civil Rights Division to investigate MDOC's COVID-19 response.  At the time Plaintiff filed the instant complaint, he had not received a response from Defendant Barr or anyone else from the DOJ.

Plaintiff alleges that, "[n]o matter what steps are taken by MDOC, because of Plaintiff's preexisting health conditions, there is no communal correctional facility where he could be incarcerated during the COVID-19 crisis that would be constitutional.  The only relief is his release from confinement . . . ."  (Compl., ECF No. 1, PageID.6.)

Plaintiff alleges that Defendants' failure to release him from custody violated the Eighth Amendment.  For relief, Plaintiff seeks declaratory relief and damages.  Construing his complaint liberally, Plaintiff also seeks release from confinement.

## II.    Failure to state a claim

A complaint may be dismissed for failure to state a claim if it fails "'to give the defendant fair notice of what the . . . claim is and the grounds upon which it rests.'"  *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007) (quoting *Conley v. Gibson*, 355 U.S. 41, 47 (1957)).  While

a complaint need not contain detailed factual allegations, a plaintiff's allegations must include more than labels and conclusions. *Twombly*, 550 U.S. at 555; *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) ("Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice."). The court must determine whether the complaint contains "enough facts to state a claim to relief that is plausible on its face." *Twombly*, 550 U.S. at 570. "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 556 U.S. at 679. Although the plausibility standard is not equivalent to a "'probability requirement,' . . . it asks for more than a sheer possibility that a defendant has acted unlawfully." *Iqbal*, 556 U.S. at 678 (quoting *Twombly*, 550 U.S. at 556). "[W]here the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged—but it has not 'show[n]'—that the pleader is entitled to relief." *Iqbal*, 556 U.S. at 679 (quoting Fed. R. Civ. P. 8(a)(2)); *see also Hill v. Lappin*, 630 F.3d 468, 470-71 (6th Cir. 2010) (holding that the *Twombly/Iqbal* plausibility standard applies to dismissals of prisoner cases on initial review under 28 U.S.C. §§ 1915A(b)(1) and 1915(e)(2)(B)(i)).

To state a claim under 42 U.S.C. § 1983, a plaintiff must allege the violation of a right secured by the federal Constitution or laws and must show that the deprivation was committed by a person acting under color of state law. *West v. Atkins*, 487 U.S. 42, 48 (1988); *Street v. Corr. Corp. of Am.*, 102 F.3d 810, 814 (6th Cir. 1996). Because § 1983 is a method for vindicating federal rights, not a source of substantive rights itself, the first step in an action under § 1983 is to identify the specific constitutional right allegedly infringed. *Albright v. Oliver*, 510 U.S. 266, 271 (1994).

### III.     Confinement

Construing the complaint with all due liberality, *see Haines*, 404 U.S. at 520, Plaintiff seeks release from confinement.

The Sixth Circuit has concluded that claims regarding conditions of confinement are properly brought under § 1983.  *See Martin v. Overton*, 391 F.3d 710, 714 (6th Cir. 2004) ("'Petitioner in this case appears to be asserting the violation of a right secured by the federal Constitution or laws by state prison officials.  Such a claim is properly brought pursuant to 42 U.S.C. § 1983.'").  Plaintiff's claims regarding the constitutionality of his custody in the prison because of risks posed by COVID-19 are principally claims regarding the conditions of his confinement.  Such claims should be raised by a complaint for violation of 42 U.S.C. § 1983.

However, to the extent Plaintiff seeks release from custody, that relief is available only on habeas corpus review.  "The Supreme Court has held that release from confinement—the remedy petitioner[] seek[s] here—is 'the heart of habeas corpus.'"  *Wilson*, 2020 WL 3056217, at *5 (quoting *Preiser,* 411 U.S. at 498).  A challenge to the fact or duration of confinement should be brought as a petition for habeas corpus and is not the proper subject of a civil rights action brought pursuant to § 1983.  *See Preiser*, 411 U.S. at 484 (the essence of habeas corpus is an attack by a person in custody upon the legality of that custody and the traditional function of the writ is to secure release from illegal custody).

Thus, insofar as Plaintiff seeks release from his confinement, that relief is unavailable in a suit brought under § 1983.

### IV.     Defendant Barr

Plaintiff alleges, under § 1983, that Defendant Barr violated his Eighth Amendment rights presumably by failing to respond or otherwise act after receiving the complaint Plaintiff sent to the DOJ.  Section 1983 pertains only to civil rights claims against state officials.  Therefore, in

4

Plaintiff's suit against Defendant Barr, a federal official, *Bivens v. Six Unknown Named Agents of the Federal Bureau of Narcotics*, 403 U.S. 388 (1971), governs.

"Under *Bivens*, a plaintiff must initially demonstrate (1) a challenged action attributable to a person acting under color of federal law, and (2) conduct that deprives the party of a constitutionally protected interest." *Left Fork Mining Co. v. Hooker*, 775 F.3d 768, 774 (6th Cir. 2014) (citing *Schweiker v. Chilicky*, 487 U.S. 412, 418-21 (1988)). "If those elements are satisfied, the Court then proceeds to a two-step inquiry to ascertain whether a *Bivens* damages remedy should be inferred." *Left Fork*, 775 F.3d at 774 (citing *Wilkie v. Robbins*, 551 U.S. 537, 550 (2007)).

"A *Bivens* remedy is available only if (1) there are no 'alternative, existing process[es]' for protecting a constitutional interest and, (2) even in the absence of an alternative, there are no 'special factors counselling hesitation before authorizing a new kind of federal litigation.'" *Left Fork*, 775 F.3d at 774 (quoting *Wilkie*, 551 U.S. at 550). "When the design of a Government program suggests that Congress has provided what it considers adequate remedial mechanisms for constitutional violations that may occur in the course of its administration, we have not created additional *Bivens* remedies." *Schweiker*, 487 U.S. at 423. Thus, "[s]o long as the plaintiff had an avenue for some redress, bedrock principles of separation of powers foreclosed judicial imposition of a new substantive liability." *Corr. Servs. Corp. v. Malesko*, 534 U.S. 61, 69 (2001) (citation omitted).

Plaintiff fails to make specific factual allegations against Defendant Barr other than his claim that Defendant Barr failed to conduct an investigation or respond to his DOJ complaint. Government officials may not be held liable for the unconstitutional conduct of their subordinates under a theory of respondeat superior or vicarious liability. *Iqbal*, 556 U.S. at 676; *Monell v. New*

*York City Dep't of Soc. Servs*., 436 U.S. 658, 691(1978); *Everson v. Leis*, 556 F.3d 484, 495 (6th Cir. 2009).   A claimed constitutional violation must be based upon active unconstitutional behavior.  *Grinter v. Knight*, 532 F.3d 567, 575-76 (6th Cir. 2008); *Greene v. Barber*, 310 F.3d 889, 899 (6th Cir. 2002).   The acts of one's subordinates are not enough, nor can supervisory liability be based upon the mere failure to act.  *Grinter*, 532 F.3d at 576; *Greene*, 310 F.3d at 899; *Summers v. Leis*, 368 F.3d 881, 888 (6th Cir. 2004).   "[A] plaintiff must plead that each Government-official defendant, through the official's own individual actions, has violated the Constitution."  *Iqbal*, 556 U.S. at 676.  Plaintiff has failed to allege that Defendant Barr engaged in any active unconstitutional behavior.  Accordingly, he fails to state a claim against Defendant Barr.

## V.      Eighth Amendment

The Eighth Amendment imposes a constitutional limitation on the power of the states to punish those convicted of crimes.  Punishment may not be "barbarous" nor may it contravene society's "evolving standards of decency."  *Rhodes v. Chapman*, 452 U.S. 337, 345-46 (1981).  The Amendment, therefore, prohibits conduct by prison officials that involves the "unnecessary and wanton infliction of pain."  *Ivey v. Wilson*, 832 F.2d 950, 954 (6th Cir. 1987) (per curiam) (quoting *Rhodes*, 452 U.S. at 346).  The deprivation alleged must result in the denial of the "minimal civilized measure of life's necessities." *Rhodes*, 452 U.S. at 347; *see also Wilson v. Yaklich*, 148 F.3d 596, 600-01 (6th Cir. 1998).  The Eighth Amendment is only concerned with "deprivations of essential food, medical care, or sanitation" or "other conditions intolerable for prison confinement."  *Rhodes*, 452 U.S. at 348 (citation omitted).  Moreover, "[n]ot every unpleasant experience a prisoner might endure while incarcerated constitutes cruel and unusual punishment within the meaning of the Eighth Amendment."  *Ivey*, 832 F.2d at 954.

In order for a prisoner to prevail on an Eighth Amendment claim, he must show that he faced a sufficiently serious risk to his health or safety and that the defendant official acted with "'deliberate indifference' to [his] health or safety." *Mingus v. Butler*, 591 F.3d 474, 479-80 (6th Cir. 2010) (citing *Farmer v. Brennan*, 511 U.S. 825, 834 (1994) (applying deliberate indifference standard to medical claims)); *see also Helling v. McKinney*, 509 U.S. 25, 35 (1993) (applying deliberate indifference standard to conditions of confinement claims)).

Plaintiff claims that, at MCF, he is in a high degree of danger of contracting COVID-19. The Court notes that as of the date that this opinion is being written, there are no confirmed cases of prisoners with COVID-19 at MCF. *See* MDOC, *Total Confirmed Prisoner and Staff Cases to Date by Location*, MDOC Response and Information on Coronavirus (COVID-19), https://medium.com/@MichiganDOC/mdoc-takes-steps-to-prevent-spread-of-coronavirus-covid-19-250f43144337 (last visited June 24, 2020). Moreover, the Court notes that the MDOC has taken extraordinary measures to limit the threat posed by COVID-19. These measures include:

**Personal Protective Equipment, cleaning and mitigation measures**
- Michigan State Industries has produced masks for all prisoners and correctional facility staff to wear. Each employee and prisoner received three masks each and the masks can be laundered and worn again. Facility staff are also permitted to bring their own PPE, such as masks, gloves and gowns. Staff are expected to wear their mask during their entire shift and prisoners are expected to also wear their masks at all times, except while eating, sleeping or showering. Michigan State Industries is also manufacturing gowns, protective eyewear and protective suits.
- All MDOC staff transporting a prisoner on or off grounds are required to be dressed in full personal protective equipment (PPE), which is available for those employees.
- All facilities have received approval from the regional sanitation officer to use bleach during facility cleaning. Facilities have enhanced cleaning efforts and cleaning products are available to clean commonly-used areas and phones before and after use. Cleaning efforts have been doubled at facilities with vulnerable prisoner populations. We have increased our production of soap and ensured that all prisoner areas and bathrooms have plentiful access to soap. Soap has been distributed to prisoners and prisoners have been told that if they need more soap they only need to ask. Additional soap will be provided at no

charge.  CDC posters detailing proper hygiene practices have been posted in correctional facilities and have also been recreated digitally so they play on TV screens throughout our facilities.  These are the same posters you will see in your community and throughout State of Michigan office buildings.

- Movements have been modified to help facilitate social distancing and the number of prisoners attending classes and meals has been reduced so prisoners can be seated farther apart.  Prisoners and staff are frequently reminded of the need for social distancing and prisoners are instructed not to gather in groups on the yard.  Activities such as basketball and weight pit have been suspended to encourage social distancing, as well.  There are also markers and cones set up for med lines and in the chow hall as a visual reference for prisoners on how far apart they should stand.

- The department has been leading the nation when it comes to consistent testing of the prisoner population when they have symptoms.  Following the completion Friday, May 22, of testing prisoners at Michigan Reformatory in Ionia for COVID-19, the Michigan Department of Corrections has completed its goal of testing every prisoner in its system.

**Visits and Transfers**
- Visitation at facilities statewide was suspended as of March 13.
- The department worked with communication vendors GTL and JPay to provide enhanced services for prisoners to communicate with family and friends during the period without visits.  JPay is continuing to offer two free stamps per week and a 10% discount on stamps through June 30, 2020.  GTL's internet and mobile fees are reduced with the regular $2.95 transaction fee reduced to $1.95 and the $1.95 transaction fee reduced to $0.95.  JPay had also offered two free stamps per week through June 2, 2020.  GTL provided one free, five-minute phone call every seven days for the first two weeks of May 2020 and, for the entire month of May, GTL reinstated the internet and mobile fees with reduced rates.  We will continue to work with the companies on anything else they may be willing to provide.

- In connection with visitation suspension, face-to-face college classes at all facilities have also been suspended effective immediately.  The MDOC will work with higher education institutions willing and able to deliver classes as correspondence courses.  Core programming and school classes taught by MDOC staff will continue.

- Outside contractors for substance abuse programming will be allowed inside and will be screened upon entry per the screening protocol.  Attorney visits will continue to be authorized.

- During this time, transfers of prisoners or staff between facilities will not be authorized without the approval of the Assistant Deputy Director or higher.

- The department issued protocol to all county sheriff offices to offer guidance on screening and other preventative measures.

**Quarantine and Care of Sick Prisoners**

- Facility healthcare staff will meet with prisoners who have presented with symptoms of coronavirus. The MDOC does not make the diagnosis of the coronavirus. The department is following the Michigan Department of Health and Human Services protocol. If a prisoner has symptoms and meets the criteria for testing, the MDOC can test the prisoner.
- Prisoners who test positive for the virus are isolated from the general population and any prisoners or staff they have had close contact with are identified and notified of the need to quarantine.
- Prisoners who test positive will be transferred to one of the department's designated quarantine units at either G. Robert Cotton Correctional Facility, Carson City Correctional Facility or the former Maxey Annex, which is located near Woodland Center Correctional Facility. The Maxey Annex previously housed juvenile offenders under the jurisdiction of MDHHS, prior to its closure, and the MDOC had been working to convert it to a training site. These units are in buildings that are completely separated from each of the correctional facilities. They have limited movement and access to these units is extremely limited. Only a small number of designated staff work in the unit in 12-hour shifts to limit the number of people entering. Those staff members report directly to the unit and do not enter the main correctional facility. Prisoners transferred to the unit also stay on the unit and do not enter any other areas of the prison.
- Prisoners who have been identified as having close contact with another prisoner who tests positive, but have not tested positive for the virus themselves, will be isolated from the general population at their facility for the 14-day quarantine period.
- Co-pays for prisoners who need to be tested for COVID-19 have been waived.
- Prisoners have been urged to notify healthcare if they are sick or experiencing symptoms of illness so they can be evaluated. Prisoners who require outside medical attention will be transported to an area hospital for treatment.

**Recovery**

- Prisoners are considered in step-down status when they no longer have symptoms, are no longer considered contagious and have been medically cleared by our chief medical officer.
- A unit has also been established at Central Michigan Correctional Facility for recovered prisoners who previously tested positive for the virus. These prisoners are considered officially recovered by the Michigan Department of Health and Human Services, have no symptoms, are not considered contagious, have been medically cleared by the MDOC's chief medical officer, and must test negative before they are moved to the unit at Central. Not all of the prisoners coming to Central's unit will come from Gus Harrison Correctional Facility's step-down unit. With the number of prisoners who are placed at the COVID positive units at Macomb Correctional Facility, G. Robert Cotton Correctional Facility and Carson City Correctional Facility, not all will move to Gus Harrison Correctional Facility, given there are only 120 beds in the

facility's step-down unit.   It is possible prisoners will come from other locations, but ONLY if they have since tested negative, and it has been 30 days at least since the onset of their symptoms.   The department is NOT sending COVID-19 positive prisoners to Central.

**Parole Information**
- The MDOC Parole Board continues to hold parole hearings and is reviewing all eligible cases to determine prisoners who can be safely released at this time.   In addition, the department will begin holding remote public Parole Board hearings for parolable life sentence and clemency cases. You can find more information on scheduled hearings and how to participate here.
- The department continues to review individual cases and the Parole Release Unit is working to process parole releases for prisoners with positive parole decisions as quickly and safely as possible.
- We are no longer allowing parole representatives to enter correctional facilities for parole hearings as an additional step to limit the potential introduction of illness.   However, individuals designated by a prisoner as a parole representatives should contact the facility where the prisoner is being housed to find out about options to call in for the hearing.
- The Parole Board is aware that prisoners do not have access to certain programming and the Board is taking that into consideration.   If there are changes in the prisoner's case, the prisoner will be notified directly.
- We continue to monitor the prisoner population, our parole and probation population and the parole process as this pandemic continues, in order to consider all options to ensure the safety of offenders under our supervision.
- All of our paroles are done with public safety in mind.   The Parole Board looks at each individual on a case-by-case basis and will only grant a parole if they believe that person will not be a harm to society.
- All prisoners set to parole must take a COVID-19 test before being released. The MDOC is working to expedite the parole release of those individuals who can safely and legally be released at this time.   There are a number of steps that are included in the parole release process, which now includes testing for COVID-19 to ensure the individual will not pose a risk to loved ones or the community upon release.   As a result, a limited number of parole dates may be changed to accommodate these processes.   If a prisoner tests positive they will not parole until they are cleared by healthcare, which is at least 14 days from the onset of symptoms.   Prisoners who test negative will be paroled as scheduled.

(*Id.*)  In addition, on May 22, 2020, the MDOC issued a press release, indicating that it had

completed testing of every prisoner in the 29-prison system in less than 15 days.  *See* MDOC Press

Release,       https://www.michigan.gov/corrections/0,4551,7-119-1441_26969-529997--,00.html

(last visited June 24, 2020).  Further, the MDOC issued a COVID-19 DOM on April 8, 2020, and

issued a revised DOM on the subject on May 26, 2020, *see* MDOC DOM 2020-30R2 (eff. May 26, 2020), and again on May 27, 2020, *see* MDOC DOM 2020-30R3 (eff. May 27, 2020) (serially outlining specific precautions to be taken by staff members, including the use of personal protective equipment and hand sanitizer).

In light of the nonexistent levels of infection at MCF and the significant measures undertaken by Defendants to secure prisoner safety and prevent infection, Plaintiff cannot show that Defendants have been deliberately indifferent to his serious risk of physical harm. While the Court is sympathetic to Plaintiff's general concern about the COVID-19 virus, speculation about the mere possibility that he will become infected by the virus does not rise to the level of an Eighth Amendment violation. Thus, Plaintiff fails to state a claim for relief—either for declaratory relief or for damages—against Defendants Washington, McKee, and Nessel.

**VI.      Pending Motions**

Plaintiff has filed motions for a preliminary injunction and declaratory relief (ECF No. 4), and for praecipe (ECF No. 6).

**A.      Preliminary injunction and Declaratory Relief**

In addition to his complaint, Plaintiff has filed what he has titled an "emergency motion for preliminary injunction and declaratory relief." (ECF No. 4, PageID.27.) As explained above, Plaintiff has failed to state a claim entitling him to declaratory relief. For the reasons described below, the Court will also deny Plaintiff's request for a preliminary injunction.

Preliminary injunctions are "one of the most drastic tools in the arsenal of judicial remedies." *Bonnell v. Lorenzo*, 241 F.3d 800, 808 (6th Cir. 2001) (quoting *Hanson Trust PLC v. ML SCM Acquisition Inc.*, 781 F.2d 264, 273 (2d Cir. 1986)). The issuance of preliminary injunctive relief is committed to the discretion of the district court. *See Ne. Ohio Coal. v.*

*Blackwell*, 467 F.3d 999, 1009 (6th Cir. 2006); *Nader v. Blackwell*, 230 F.3d 833, 834 (6th Cir. 2000).

In exercising that discretion, a court must consider whether plaintiff has established the following elements: (1) a strong or substantial likelihood of success on the merits; (2) the likelihood of irreparable injury if the preliminary injunction does not issue; (3) the absence of harm to other parties; and (4) the protection of the public interest by issuance of the injunction. *Id.* These factors are not prerequisites to the grant or denial of injunctive relief, but factors that must be "carefully balanced" by the district court in exercising its equitable powers. *Frisch's Rest., Inc. v. Shoney's, Inc.*, 759 F.2d 1261, 1263 (6th Cir. 1985); *see also S. Galzer's Distribs. of Ohio, LLC v. Great Lakes Brewing Co.*, 860 F.3d 844, 849 (6th Cir. 2017) ("[T]hese are factors to be balanced, not prerequisites to be met."); *National Viatical, Inc. v. Universal Settlements Int'l, Inc.*, 716 F.3d 952, 956 (6th Cir. 2013) (same); *Ne. Ohio Coal.*, 467 F.3d at 1009 (same).  Moreover, where a prison inmate seeks an order enjoining state prison officials, the court is required to proceed with the utmost care and must recognize the unique nature of the prison setting. *See Glover v. Johnson*, 855 F.2d 277, 284 (6th Cir. 1988); *Kendrick v. Bland*, 740 F.2d 432, 438 n.3 (6th Cir. 1984).  The party seeking injunctive relief bears a heavy burden of establishing that the extraordinary and drastic remedy sought is appropriate under the circumstances. *See Overstreet v. Lexington-Fayette Urban Cty. Gov't*, 305 F.3d 566, 573 (6th Cir. 2002); *Stenberg v. Cheker Oil Co.*, 573 F.2d 921, 925 (6th Cir. 1978).

Under controlling Sixth Circuit authority, Plaintiff's "initial burden" in demonstrating entitlement to preliminary injunctive relief is a showing of a strong or substantial likelihood of success on the merits of his section 1983 action. *NAACP v. Mansfield*, 866 F.2d 162,

167 (6th Cir. 1989).  Because Plaintiff has failed to state claims for relief, he certainly has not shown a strong likelihood of success on the merits.

Second, although COVID-19 infection carries the risk of causing irreparable harm, Plaintiff has failed to show that he is subject to any risk, much less a significant risk, of COVID-19 infection under the present circumstances.  Therefore, Plaintiff's allegations fail to demonstrate irreparable harm that is avoidable only by a preliminary injunction.

Finally, the interests of identifiable third parties and the public at large weigh against an injunction.  Decisions concerning prison security are vested in prison officials, in the absence of a constitutional violation.  Any interference by the federal courts in the administration of state prisons is necessarily disruptive.  The public welfare therefore militates against the issuance of extraordinary relief in the prison context, absent a sufficient showing of a violation of constitutional rights.  *See Glover*, 855 F.2d at 286-87.  That showing has not been made here.  Accordingly, Plaintiff's motion for preliminary relief will be denied.

B.    **Motion to Schedule Hearing**

The Court has determined that a hearing is not necessary to resolve the issues raised by Plaintiff's complaint.  Accordingly, his motion for praecipe, requesting a hearing (ECF No. 6), will be denied.

## Conclusion

Having conducted the review required by the Prison Litigation Reform Act, the Court determines that Plaintiff's complaint will be dismissed for failure to state a claim, under 28 U.S.C. §§ 1915(e)(2) and 1915A(b), and 42 U.S.C. § 1997e(c).  The Court will also deny Plaintiff's pending motions.  The Court must next decide whether an appeal of this action would be in good faith within the meaning of 28 U.S.C. § 1915(a)(3).  *See McGore v. Wrigglesworth*, 114 F.3d 601, 611 (6th Cir. 1997).  The Court does not certify that an appeal would not be in good faith.

Should Plaintiff appeal this decision, the Court will assess the $505.00 appellate filing fee pursuant to § 1915(b)(1), *see McGore*, 114 F.3d at 610-11, unless Plaintiff is barred from proceeding *in forma pauperis*, *e.g.*, by the "three-strikes" rule of § 1915(g).  If he is barred, he will be required to pay the $505.00 appellate filing fee in one lump sum.

This is a dismissal as described by 28 U.S.C. § 1915(g).

An order and judgment consistent with this opinion will be entered.


Dated:   June 29, 2020                                   /s/ Janet T. Neff
                                                         Janet T. Neff
                                                         United States District Judge